**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on May 3, 2016, which may be different from its entry on the record.**

**IT IS SO ORDERED.**

**Dated: May 3, 2016**



_____
ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Chapter 7 Proceedings |
| | ) | |
| RICK ST. GEORGE, | ) | Case No. 14-16075 |
|     Debtor. | ) | |
| _____ | ) | |
| | ) | Judge Arthur I. Harris |
| DANIEL M. McDERMOTT, | ) | |
| UNITED STATES TRUSTEE, | ) | Adversary Proceeding |
|     Plaintiff, | ) | No. 15-1063 |
| | ) | |
| v. | ) | |
| | ) | |
| RICK ST. GEORGE, | ) | |
|     Defendant. | ) | |
| | ) | |

## MEMORANDUM OF OPINION[1]

In this adversary proceeding, the U.S. Trustee seeks to deny the debtor Rick

St. George a bankruptcy discharge under various subdivisions of 11 U.S.C.

§ 727(a).  For the reasons that follow, the Court denies the debtor a discharge

_____
[1] This opinion is not intended for official publication.

under the alternative theories of failing to keep or preserve records under

11 U.S.C. § 727(a)(3) and failing to adequately explain dissipation of assets under

11 U.S.C. § 727(a)(5). The Court therefore finds it unnecessary to address the

U.S. Trustee's other theories for denying the debtor a discharge, as well as any

corresponding defenses of the debtor.

## JURISDICTION

An action to determine an objection to discharge is a core proceeding

under 28 U.S.C. § 157(b)(2)(J). This Court has jurisdiction over core proceedings

under 28 U.S.C. §§ 157(a) and 1334 and Local General Rule 2012-7 by the United

States District Court for the Northern District of Ohio.

## PROCEDURAL HISTORY

The debtor filed a Chapter 7 voluntary petition on September 23, 2014

(Case No. 14-16075). On December 10, 2014, the U.S. Trustee moved for

additional time, until February 27, 2015, to object to the debtor's discharge under

11 U.S.C. § 727. The Court granted this unopposed motion to extend time. On

February 23, 2015, the U.S. Trustee filed a second motion to extend the time to

file an objection to the debtor's discharge until May 13, 2015, which the debtor

opposed. The Court denied this second motion to extend time on March 24, 2015,

but gave the U.S. Trustee until April 3, 2015, to file a complaint objecting to the

2

debtor's discharge. On April 2, 2015, the U.S. Trustee filed a complaint seeking a denial of the debtor's discharge (Adv. Pro. No. 15-1063). Meanwhile, on April 7, 2015, the debtor filed a notice of appeal of the March 24, 2015, order addressing the U.S. Trustee's second motion to extend time. The Bankruptcy Appellate Panel dismissed the debtor's appeal on May 2, 2015.

The U.S. Trustee's adversary complaint seeks to deny the debtor a bankruptcy discharge under various subdivisions of 11 U.S.C. § 727(a). In Count 1, the U.S. Trustee asserts that the debtor's discharge must be denied under 11 U.S.C. § 727(a)(2) because the debtor, with the intent to hinder, delay, or defraud one or more creditors, transferred, removed, destroyed, mutilated, or concealed property of the debtor within one year before the filing of the petition or after the petition date. In Count 2, the U.S. Trustee asserts that the debtor's discharge must be denied under 11 U.S.C. § 727(a)(3) because the debtor has concealed, destroyed, or failed to keep or preserve recorded information from which the debtor's financial condition or business transactions might be ascertained. In Count 3, the U.S. Trustee asserts that the debtor's discharge must be denied under 11 U.S.C. § 727(a)(4)(A) because the debtor knowingly and fraudulently made one or more false oaths or accounts in connection with the case. In Count 4, the U.S. Trustee asserts that the debtor's discharge must be denied

3

under 11 U.S.C. § 727(a)(4)(D) because the debtor knowingly and fraudulently withheld from the U.S. Trustee certain recorded information relating to the debtor's property or financial affairs. In Count 5, the U.S. Trustee asserts that the debtor's discharge must be denied under 11 U.S.C. § 727(a)(5) because the debtor has not adequately explained the loss of assets or deficiency of assets to meet the debtor's liabilities.

On March 9, 2016, the Court held a trial on the U.S. Trustee's complaint to deny the debtor's discharge. Three witnesses testified at trial: Rick St. George, the debtor; Catherine Lowman, a bankruptcy analyst for the U.S. Trustee; and Lawrence Anderson, a creditor. The Court admitted without objection Plaintiff's Exhibits 1-5, 7-8, 9 (as redacted), 10-11, 13, 17-20, and 22-34, and Debtor's Exhibits A and D. The Court admitted Plaintiff's Exhibits 35 and 36 over the debtor's objection.

## FINDINGS OF FACT

The findings of fact contained in this memorandum of opinion reflect the Court's weighing of the evidence, including credibility of the witnesses. "In doing so, the court considered the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language, or nuance of expression." *In re*

4

*Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this decision, the Court considered the testimony of all the trial witnesses, exhibits admitted into evidence, and any stipulations. Unless otherwise indicated, the following facts were established at trial by a preponderance of the evidence.

Although much of the testimony at trial focused on events that happened years before the debtor filed for bankruptcy, the Court will only address these earlier events to the extent that they are relevant to establishing claims and defenses under Counts 2 and 5 of the adversary proceeding.

*Pre-2007*

Before getting into the sale and marketing of annuities, the debtor waited tables in New York City, California, and Florida. He did not attend college and has no other degrees. In 1988, he became licensed to sell insurance products in Florida and began selling Medicare insurance supplements. Around 1990, the debtor and business partner Geoffrey Frazier started Global Financial Advisory, Inc., a for-profit Florida corporation, through which the debtor sold variable and fixed annuities. In 2003, Frazier and the debtor purchased a $900,000 commercial building together for Global Financial Advisory's operations, located at 2080 Ringling Boulevard, in Sarasota, Florida. Upon purchase, the debtor owned a 1/3rd interest in this Sarasota building. In 2004, the debtor was forced out of

5

Global Financial Advisory after the IRS audited the company. According to the debtor, the IRS initially found that the debtor had a $348,000 tax liability, which resulted in a tax lien recorded in Sarasota County, Florida, on July 11, 2011. According to the proof of claim filed by the IRS, as of September 23, 2014, the debtor owes nearly $3 million in taxes, penalties, and interest for unpaid personal income taxes for calendar years 2001–2005 and 2008.

Once the debtor ceased working at Global Financial Advisory, he founded Global Financial Insurance Services [hereinafter, "Global Financial"], a Florida for-profit corporation incorporated on August 17, 2004. The debtor was the sole shareholder of Global Financial. Through Global Financial, the debtor marketed fixed-rate investment products to clients. Global Financial is the successor corporation to a company called Gulf Coast Financial Insurance Services.

While living in Florida, the debtor maintained his personal residence at 692 Oaks Creek Court, in Osprey, Florida, which he had purchased in 2000. In February of 2006, the debtor took out two mortgages on his residence in the amounts of $2.4 million and $500,000 (Plaintiff's Ex. 19).

*2007: Debtor meets the Andersons and Aaron Hendra*

While in Florida in late 2006 or early 2007, the debtor met one of his future creditors, Camille Anderson. Camille Anderson was a good friend of the debtor's then-girlfriend and future wife, Tamie Sheffield, who introduced the debtor to

6

Camille Anderson. Camille Anderson told her parents, Larry and Sharon Anderson, about the debtor and, in December of 2007, her parents spoke on the phone with the debtor. The debtor encouraged Larry, Sharon, and Camille Anderson to invest in Sunovia (now, Evolucia) stock, a Florida company that specializes in LED and solar lighting. The debtor told the Andersons he believed that the value of Sunovia stock would rise from 10 cents a share to a dollar a share, and that he "personally believed" it would rise to $80 to $100 a share. The debtor and the Andersons had intermittent phone conversations over the next few years regarding Sunovia stock and the Andersons' other investments.

In the latter part of 2007, the debtor married Tamie Sheffield, and they remain legally married. The debtor relocated from Florida to California in 2007 due to his marriage. In California, Tamie Sheffield introduced the debtor to the musician Aaron Hendra. After hearing Hendra sing, the debtor immediately was drawn to Hendra's music and pledged an initial $20,000 towards the creation of an album.

While living in California, the debtor continued selling fixed annuities through Global Financial, sought investors for Flava Puff (a snack foods company), and produced eight motion pictures. To produce these motion pictures, the debtor invested his own funds and solicited investments from other people, with the promise of a return if the movie succeeded. However, none of the motion

7

pictures was a success, and many investors lost money. For example, Camille Anderson invested $50,000 in one of the motion pictures and got $8,000 back. The debtor did not list his interest in the eight motion pictures on his Schedule B, and asserts that he never made any profit from them.

*2008: Give Records is Born*

On January 31, 2008, Larry Anderson purchased 1 million shares of Sunovia stock for $100,000 on the debtor's recommendation (Plaintiff's Ex. 7). The debtor verbally made a personal guarantee to Larry Anderson for his purchase of Sunovia stock, and later signed a notarized personal guarantee for the same stock purchase on December 22, 2010 (Plaintiff's Ex. 10). On Schedule F, the debtor lists the 2008 personal guarantee to Larry and Sharon Anderson (Plaintiff's Ex. 1-20). Larry Anderson also invested $540,000 in Flava Puff through the debtor in 2008. The return on this investment was 15 percent for five years, paid monthly.

The debtor founded Give Records, a Florida LLC, in 2008 to promote the musical career of Aaron Hendra. There is inconsistent testimony regarding the ownership of Give Records. On Give Records' tax returns, the debtor listed himself as the sole shareholder of the corporation (Plaintiff's Ex. 30-7, 31-9). At the meeting of creditors and at his deposition, the debtor asserted that he is the sole owner of Give Records (Plaintiff's Ex. 35-30, 36-7). During trial, the debtor

8

testified that he and Hendra are co-owners of Give Records. Accordingly to the debtor, the contract between the debtor and Hendra purportedly stipulates that 70 percent of any profits made by Give Records would go to Hendra and 30 percent of any profits would go to the debtor (Plaintiff's Ex. 35-31).

In 2008, the debtor began renting a house at 1120 La Collina Drive, Beverly Hills, CA 90210 [hereinafter, "La Collina"] for approximately $35,000 per month to house a music studio, Aaron Hendra, several band members, and himself. The debtor also leased a number of vehicles while living at La Collina, including a Rolls Royce, a Bentley, and a Mercedes. Global Financial paid the $35,000 monthly rent for the La Collina residence and the lease payments for the vehicles. To furnish the residence, Camille Anderson took the debtor to a used furniture store, where he bought $60,000 to $70,000 worth of furniture for around $10,000. The debtor and the band members lived at La Collina for approximately two years. On average, the debtor transferred $5,000 to $6,000 a month from Global Financial's bank account to Give Records' bank account for Aaron Hendra's living expenses. This monthly transfer continued for many years.

*2009*

In 2009, the debtor referred Larry Anderson to Kristin Nobles (the CEO of Noble Communications Group) about investing $200,000 in a debenture bond with Noble Communications, promising a return of 9 percent in one year (Plaintiff's Ex.

9

8). The debtor gave Larry Anderson a verbal, personal guarantee at the time of the investment and later signed a notarized personal guarantee for the same investment on December 22, 2010 (Plaintiff's Ex. 10). This guarantee is included in the debt owed to Larry and Sharon Anderson on Schedule F (Plaintiff's Ex. 1-20). The $200,000 invested in the debenture bond needed to be put into an IRA within 60 days of the investment, and the debtor promised Larry Anderson that Kristin Nobles would do so.

*2010*

In March of 2010, Kristin Nobles gave the debtor a tax form (Form 5498) to give to Larry Anderson. The Form 5498 allegedly showed that the $200,000 was put into an IRA (Plaintiff's Ex. 9). However, the $200,000 was never placed into an IRA, and the handwritten tax form was falsified. Although there is an IRA number listed on the form, it is an anagram of two tax ID's, and an IRA never existed with this number. The debtor asserts that Kristin Nobles created the false tax document. Larry Anderson stated that he has no knowledge of who falsified the form.

The debtor transferred his 1/3 interest in the commercial building located at 2080 Ringling Boulevard in Sarasota, Florida (out of which Global Financial Advisory operated) to another creditor, Ron Smythe, to satisfy a debt. Along with the real property, the debtor transferred all the furnishings and assets (including

10

artwork) located in the building to Ron Smythe as well. The debtor's testimony was inconsistent as to the date of the transfer. At the meeting of creditors, he said 2005, 2006, and 2010 through 2012 could have been when he transferred his interest (Plaintiff's Ex. 35-26, 35-27, and 35-101). At trial, the debtor testified that he transferred the interest in 2010. At his deposition, the debtor testified that he was still occupying his part of the building in 2011 and 2012 while he spent six months in Florida every year (Plaintiff's Ex. 36-113).

In November of 2010, the debtor moved from La Collina to a house in nearby Coldwater Canyon, which he rented for $15,000 a month. Global Financial paid the $15,000 in rent each month. The debtor asserted that the band members did not live at Coldwater Canyon. The debtor lived at the Coldwater Canyon residence for three years.

### 2011: The Tax Lien is Recorded

On July 11, 2011, the IRS recorded a tax lien against the debtor in Sarasota County, Florida (Claim No. 3-1), which totaled nearly $3 million as of the petition date. The insurance companies that the debtor had contracted with began cancelling his contracts due to the tax lien, and the debtor believed that the tax lien sparked his downward financial spiral.

### 2012

In October of 2012, the debtor sold his personal residence at 692 Oaks Creek

11

Court, in Osprey, Florida, for $1.6 million. The debtor did not make any money from the sale, but eliminated $3.3 million in debt.

Pertaining to tax year 2012, the debtor provided the U.S. Trustee with tax returns for Global Financial, Give Records, and himself individually, all prepared by the debtor's CPA, Howard R. Womeldorph, Jr., in Bradenton, Florida. In 2012, Global Financial reported $641,831 in gross receipts and sales and $48,334 in ordinary business income (Plaintiff's Ex. 29, filed November 15, 2013). Global Financial's depreciation report lists assets placed in service from September 2004 to September 2009. Among the more valuable assets are pieces of artwork by Osvath and Bliss located at 2080 Ringling Boulevard in Sarasota, Florida (the same property that the debtor transferred to Ron Smythe). The artwork value ranges from $4,400 to $53,555. The debtor's explanation for the disposition of the furniture, artwork, computers, and other assets from 2080 Ringling Boulevard is that, in 2012, "they weren't worth anything and [I] basically just got rid of them, because there was – there was no value." (Plaintiff. Ex. 35-23). In particular, the debtor stated that he gave the original artwork back to the artist in 2012 or 2013 (Plaintiff's Ex. 35-25). The debtor testified that the artwork had no value and he could not even give it away. However, the debtor also testified that when he transferred the 1/3 interest in the 2080 Ringling Boulevard property to Ron Smythe, all of the furniture, artwork, and other assets were part of that transfer.

12

The debtor stated that his CPA advised him that he could continue to depreciate the assets at 2080 Ringing Boulevard even though the debtor did not own them anymore.

On Form 1120S (Other Deductions) for 2012, Global Financial lists $117,028 paid in consulting fees (Plaintiff's Ex. 29-15). During the U.S. Trustee's deposition of the debtor, the debtor was asked specifically about the $117,028 in 2012 consulting fees. The debtor stated, "I'd have to ask Howard on that one, 117. Yeah it's probably – has something to do with commissions or sales or some kind. I'd have to find out what Howard – what he did though." (Plaintiff's Ex. 36-115, 36-116).

On its 2012 tax return (filed 11/15/2013), Give Records reported no income, a loss of $65,979, and $499,176 in inventory, which appears to be the amount of money that the debtor had put into the business, as opposed to, say, almost $500,000 in physical inventory such as unsold music CDs (Plaintiff's Ex. 31). The balance sheet (Plaintiff's Ex. 31-4) was left blank. The depreciation report shows 19 assets placed in service in 2012, valued at $18,725. The report shows 30 assets placed in service between 2008 and 2011, including a piano costing $12,500 and "equipment" costing $25,000. The total cost of the assets, purchased by Give Records from 2008 to 2012, was $137,171. The Chapter 7 trustee asked that the debtor provide a signed statement explaining what happened to the $137,171 of

13

Give Records' assets; this was never provided (Plaintiff's Ex. 17). When asked the question "What assets does Give Records, Inc., own?" the debtor stated, "Zero, nothing, just his [Aaron Hendra's] singing ability." (Plaintiff's Ex. 35-31). Similarly, at trial, the debtor disavowed that Give Records ever owned any musical equipment, explaining that the musicians themselves owned their own gear. The debtor's explanation for the expansive list of assets on the 2012 Give Records tax return is that the CPA mixed up Give Records' tax return with Aaron Hendra's tax return. The debtor believes this depreciation report should actually be attached to Hendra's tax return. However, during the U.S. Trustee's deposition of the debtor, he affirmatively identified the assets on the 2012 Give Records depreciation report as the musical equipment from La Collina (Plaintiff's Ex. 36-120). He said, "This is when we got rid of all the stuff from the studio . . . from La Collina," adding that he sold it for cash or checks. (Plaintiff's Ex. 36-120, 36-126). The debtor also stated that Hendra and the other band members owned a lot of equipment because it was "stuff that I — that I helped them with over a nine-year period. And plus, they own stuff, too." (Plaintiff's Ex. 36-123).

Moreover, the debtor gave conflicting testimony regarding one piece of valuable recording equipment in particular – the vintage Neve 8068, a recording console purportedly owned by Michael Jackson and used to produce "Thriller." The debtor's testimony at trial was that Give Records never purchased the Neve.

14

Instead, Aaron Hendra's band engineer knew Tito Jackson, and the band rented the Neve for $1,000 a month. The debtor's testimony at the meeting of creditors was that the band borrowed the Neve and later returned it (Plaintiff's Ex. 35-111). Later on in the meeting of creditors, the trustee asked, "My question is, where is the Neve?", to which the debtor replied, "That's all Aaron's stuff. That's all in Dallas . . . So he [Aaron] took that Neve and the guitars . . . All that stuff is his, Aaron Hendra's." (Plaintiff's Ex. 35-116). The whereabouts and ownership of the Neve is further complicated by a blog post of Aaron Hendra's in March of 2014. Aaron wrote, "[I] spent three 16 hour days personally disassembling *our* vintage Neve 8068 recording console . . . Gigi and I packed it all into a Penske truck and drove it to Cleveland to our new music base." (Plaintiff's Ex. 27-3) [emphasis added].

The debtor's 2012 individual tax return (filed April 16, 2013) listed an address in Sarasota, Florida, and identified the debtor as single (Plaintiff's Ex. 33). The debtor reported wages of $36,000. Two Form 1099-C's show $1,575,864 in cancelled debt from two mortgages (Plaintiff's Ex. 33-24, 33-25). Schedule C assigns $173,278 of the gross receipts or sales from Gulf Coast Insurance Services to Global Financial (Plaintiff's Ex. 33-8). This $173,278 of income is not traceable on Global Financial's 2012 tax return.

*2013: The Move to Cleveland*

In November of 2013, the debtor moved from Coldwater Canyon in

15

California to Brecksville, Ohio. The debtor gave away the used furniture from the La Collina and Coldwater Canyon residences to friends when he moved to Ohio. The debtor maintained that he did not sell any furniture or music equipment during the moving process; instead, he borrowed money from friends and family and used Global Financial's gross revenues in order to make the move to Ohio. The debtor moved into a residence located at 9225 Province Lane, Brecksville, Ohio, which he rented for $7,000 a month and included furnishings that came with the house. Global Financial paid the rent.

The debtor provided his 2013 tax returns for Global Financial, Give Records, and himself individually, all prepared by his CPA, Howard Womeldorph. However, the tax returns for Global Financial and Give Records are incomplete. No depreciation reports are included, although depreciation in the amount of $30,092 is claimed between the two businesses, and $137,171 of depreciated assets are listed on Give Records' 2012 tax return.

On its 2013 tax return (filed June 19, 2014), Global Financial reported $382,128 in gross receipts and sales and $45,256 in ordinary business income, while claiming depreciation in the amount of $17,237 (Plaintiff's Ex. 28-1). On Form 1120S (Other Deductions) for 2013, Global Financial lists $57,327 in consulting fees (Plaintiff's Ex. 28-8). During his deposition, the debtor stated that the consulting fees "could have been [Ron] Smythe. It could have been legal fees.

16

I don't know, probably Smythe, legal fees." (Plaintiff's Ex. 36-91).

On its 2013 tax return (filed June 18, 2014), Give Records reports no income, a loss of $45,474, and inventory in the amount of $587,376 (Plaintiff's Ex. 30). Although claiming depreciation of $12,855, Give Records did not provide a statement of depreciation or a depreciation report listing the depreciated assets.

The debtor's 2013 individual tax return (filed June 19, 2014) lists as his address 9225 Province Lane, Brecksville, Ohio, and reports wages of $36,000 (Plaintiff's Ex. 32). Schedule C (Profit or Loss from Business) reports gross receipts or sales of $5,366, assigned to Global Financial (Plaintiff's Ex. 32-3).

*2014: Global's Last Year of Operation*

The debtor provided the 2014 tax returns for Global Financial and himself individually, but did not provide the 2014 tax return for Give Records. Global Financial's 2014 tax return is designated as its final tax return.

Global Financial's 2014 tax return was filed on May 26, 2015, and indicates gross receipts or sales of $512,553 and ordinary business income of $145,005 (Plaintiff's Ex. 39-2). The tax return also contains Form 4797 (Sales of Business Property), showing the sale of leasehold improvements, equipment, and furniture for $0. The property was acquired in June of 2005, October of 2008, and December of 2008, respectively. According to Catherine Lowman, the U.S. Trustee's bankruptcy analyst, this tax return shows income of $181,000 that is

17

untraceable in the bank records of Global Financial.

The debtor's 2014 individual tax return reports wages of $36,000 and $737,766 in losses from partnerships and S corporations (Schedule E, Form 1040) (Plaintiff's Ex. 40-6). A loss of $824,421 is reported for Give Records (Plaintiff's Ex. 40-6). This loss is not explained because the 2014 Give Records tax return was never provided. On Schedule E, the debtor lists his interests in Give Records, Global Financial Insurance Services, Global Financial Advisory, and Bald Diner, LLC [hereinafter, "Bald Diner"]. The debtor's partnership interest in Bald Diner was not disclosed in his bankruptcy schedules, nor was it disclosed to the U.S. Trustee until Friday, March 4, 2016, via this tax return (five days before trial). The debtor alluded to this interest during his deposition, but does not mention Bald Diner by name. During the deposition, he described an Ayurveda that was about to lose its business space due to financial problems; the debtor helped by getting the Ayurveda a loan on the building (Plaintiff's Ex. 36-107). During trial, the debtor was unable to specify the year when this transaction occurred, saying it was somewhere in the 2000s. The debtor believes his CPA used the debtor's interest in Bald Diner as a write-off for tax year 2014. The debtor provided no tax returns, profit and loss statements, balance sheets, 1099's, or any other documentation regarding Bald Diner.

18

*The 12-Month Period Preceding the Debtor's Bankruptcy Filing*

The twelve-month period preceding the debtor's bankruptcy ran from September 23, 2013, through September 23, 2014. During this time period, and, presumably, for a number of years beforehand, the debtor did not maintain or use a personal checking account. Instead, he has used Global Financial's account at Stearns Bank to pay rent, food, Aaron Hendra's salary, and business expenses. Additionally, the debtor's usual practice was to charge his personal and business expenses to an American Express card, which was paid off by Global Financial every month. Thus, the financial documents that the debtor produced were those of Global Financial. The debtor provided several bank statements for Global Financial and Give Records from the 90-day preference period (Plaintiff's Ex. 23), his check registers for Global Financial (Plaintiff's Ex. 24), and a compendium of Global Financial's cancelled checks from October 2013 to October 2014 (Plaintiff's Ex. 25). The debtor did not provide check registers for Give Records. Catherine Lowman analyzed the debtor's financial records and broke down prepetition and postpetition deposits, withdrawals, and transfers between Global Financial and Give Records (Plaintiff's Ex. 26).

*Prepetition & Postpetition Deposits into Global Financial's Bank Account*

For the period of January 7, 2014, to September 19, 2014, Catherine Lowman added up a total of $230,956.16 of prepetition deposits into the bank

account of Global Financial (Plaintiff's Ex. 26-1). Most of these deposits are related to Flava Puff (designated by the initials "FP"). For the period of September 25, 2014, to November 5, 2014, Global Financial's postpetition deposits added up to $100,280.49. By analyzing the bank records along with the Global Financial's 2014 tax return (which reports gross receipts and sales of $512,000), Catherine Lowman testified that $181,000 was reported on the tax return but did not show up in Global Financial's bank records. Additionally, the average monthly deposit into Global Financial's bank account was nine times the amount reported by the debtor on Schedule I.

### Transfers Between Global Financial and Give Records

From January 16, 2014, to July 16, 2014, Give Records transferred $13,800 to Global Financial. Between December 13, 2013, and September 2, 2014, Global Financial transferred $43,030 to Give Records (the total prepetition transfers), resulting in a net prepetition transfer of $29,230 to Give Records. Postpetition, Global Financial transferred $32,541 to Give Records from September 29, 2014, to November 3, 2014.

### Miscellaneous Payments from Global Financial's Bank Account

On January 7, 2014, Global Financial's bank records show a payment to Kathleen and Jim King for $4,200. On January 8, 2014, and October 15, 2014, Global Financial paid Joseph Allega $44,000. The debtor stated that the $44,000

20

payment was for the rental of the 9225 Province Lane residence in Brecksville, Ohio.

During the 90 days prepetition, Global Financial's bank records show $8,795 in payments to the debtor's creditors, including Camille Anderson, Ron Smythe, and Klaus Geithner.

*September 23, 2014: The Debtor Files for Bankruptcy*

On September 23, 2014, the debtor filed his Chapter 7 petition. The address on his petition is 9225 Province Lane, Brecksville, Ohio. On Schedule B, the debtor disclosed the following property: $50 cash on hand; $20 in a Chase Bank checking account; $500 of computers; $400 clothing; an IRA valued at $1,000; the debtor's interest in Global Financial and Give Records, both valued at $0; and a 2007 Dodge Charger, valued at $6,000 (Plaintiff's Exs. 1-9, 1-10, 1-11). The debtor failed to disclose his interest in any motion pictures or Bald Diner. On Schedule F, the debtor lists his personal guarantee to Larry and Sharon Anderson for $300,000, but does not list his guarantee to Camille Anderson (Plaintiff's Ex. 1-20). The debtor's Schedule I shows monthly income of $0 and interest and dividends of $3,000 monthly (Plaintiff's Ex. 1-24, 1-25). The debtor reported his monthly rental expense as $0 on Schedule J (Plaintiff's Ex. 1-26). On his Statement of Financial Affairs, the debtor reported that his 2012 income was $36,000; his 2013 income was $36,000; and his 2014 income to date was $24,000

21

(Plaintiff's Ex. 1-29). The debtor did not disclose his payments during the 90-day preference period to Camille Anderson, Ron Smythe, and Klaus Geithner (a total of $8,795) on his Statement of Financial Affairs.

The meeting of creditors was originally scheduled for October 30, 2014, but was adjourned to November 13, 2014. The Chapter 7 trustee sent an e-mail to the debtor's attorney on October 31, 2014, requesting that the debtor provide the following documents (Plaintiff's Ex. 17), which the U.S. Trustee accessed through the Chapter 7 trustee:

(1) Copy of all notices of lien filed by the IRS in any and all locations;

(2) 2013 federal income tax return for the debtor with attached schedules, W-2s, and/or 1099s;

(3) 1099s issued for Global Financial and Give Records for 2011, 2012, and 2013;

(4) Profit and Loss Statements and Balance Sheets of Global Financial and Give Records;

(5) Depreciation & Amortization Reports for the 2013 tax returns of Global Financial and Give Records;

(6) The debtor's signed statement confirming what happened to the $137,171 worth of equipment and hard assets appearing on the 2012 tax return for Give Records;

(7) The debtor's individual bank statements from June through September 2014;

(8) The check register for Global Financial from January 2014 through September 2014;

15-01063-aih    Doc 22    FILED 05/03/16    ENTERED 05/03/16 10:25:51    Page 22 of 49

(9) All invoices or statements to identify and explain the source and consideration of various deposits and wire transfer credits made to Global Financial's bank account from June through September 2014;

(10) Documentation regarding the disclosed IRA;

(11) Records of all purchases, sales, and divestments of Sunovia and Evolucia stock, including the dates and amounts;

(12) Name and address of the law firm and lead attorneys retained to represent Evolucia and its shareholders in the planned lawsuit for patent infringement;

(13) Current address and telephone number for Ron Smythe.

Catherine Lowman testified credibly and in detail as to the completeness (or lack thereof) of the debtor's responses to the items requested. As to items 2 through 5, the debtor provided his federal income tax return for 2013, but the return was incomplete. The 2013 depreciation and amortization reports for Global Financial and Give Records were also incomplete. No 1099s or W-2s were provided. Nor did the debtor provide any profit and loss statements or balance sheets for Global Financial or Give Records. Apparently, no profit and loss statements and balance sheets were ever kept for Global Financial or Give Records. For accounting purposes, the debtor received a salary from Global Financial of $3,000 per month, but apparently never received a paycheck. Instead, the debtor would simply use Global Financial to pay all of his business and personal expenses, including the rent for his residence and all credit card charges. At all

23

relevant times, including 2012-2014, the debtor never maintained a personal checking account.

As to item 9, the debtor provided no detailed information to explain the sources of the various deposits made to Global Financial's bank account.

The U.S. Trustee was satisfied with the debtor's response to items 1, 7-8, and 10-13.

On December 3, 2014, the debtor filed an amended Schedule F to add additional creditors, but did not include Camille Anderson (Plaintiff's Ex. 4). The meeting of creditors was adjourned again to December 11, 2014, and concluded on December 15, 2014, based on the debtor's production of documents.

In November of 2014, the debtor organized a new corporation called Cleveland Financial Services, Inc, incorporated in Florida.

<em>2015</em>

The U.S. Trustee filed an adversary complaint objecting to discharge on April 2, 2015, and conducted a 2004 examination of the debtor on April 12, 2015. The state of Florida administratively dissolved Global Financial in September of 2015 for its failure to file necessary annual reports. In November of 2015, the debtor moved from the Brecksville residence at 9225 Province Lane to an address in Garfield Heights, Ohio, which he rents for $500 per month from his business partner, Matt Andrea.

24

*Present Day*

As of the present day, the debtor is still licensed to sell insurance in Florida, California, and Ohio. However, due to the 2011 tax lien filed against the debtor for unpaid income taxes, insurance companies have terminated their contracts with the debtor, making it difficult for him to sell insurance products. Currently, the debtor and his business partner, Matt Andrea, operate an insurance sales business out of 6524 Crabtree Lane, Brecksville, Ohio, where Matt Andrea resides. Matt Andrea sells the insurance products, while the debtor is in charge of marketing. The debtor drives a Honda Odyssey co-signed by his aunt.

## CONCLUSIONS OF LAW

The U.S. Trustee, the party seeking to deny the debtor's discharge, must prove each element of an action under § 727 by a preponderance of the evidence. *See* Fed. R. Bankr. P. 4005; *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654 (1991); *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679 (6th Cir. 2000). An action to deny the debtor a discharge is to be construed liberally in favor of the debtor and strictly against the party seeking denial of discharge. *See Keeney*, 227 F.3d at 683.

Although the U.S. Trustee seeks to deny the debtor a bankruptcy discharge under various subdivisions of 11 U.S.C. § 727(a), the Court will only address two of the five counts in the adversary complaint: Count 2 – failing to keep or preserve

25

records under 11 U.S.C. § 727(a)(3), and Count 5 – failing to adequately explain

dissipation of assets under 11 U.S.C. § 727(a)(5).  As the Court finds that the

U.S. Trustee has established the elements necessary to deny a discharge by a

preponderance of the evidence under both of these alternative theories, the Court

finds it unnecessary to address the U.S. Trustee's other theories for denying the

debtor a discharge, as well as any corresponding defenses of the debtor.

*Count 2 – Failing to Keep or Preserve Records under 11 U.S.C. § 727(a)(3)*

11 U.S.C. § 727 provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless –
> * * * *
> (3) the debtor has concealed, destroyed, mutilated, falsified,
> or failed to keep or preserve any recorded information,
> including books, documents, records, and papers, from which
> the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified
> under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).  The purpose of § 727(a)(3) is to require the debtor to

provide creditors "with enough information to ascertain the debtor's financial

condition and track his financial dealings with substantial completeness and

accuracy for a reasonable period past to present."  *Turoczy Bonding Co. v. Strbac*

*(In re Strbac)*, 235 B.R. 880, 882 (B.A.P. 6th Cir. 1999) (quoting *In re Martin*,

141 B.R. 986, 995 (Bankr. N.D. Ill. 1992)).  *Accord In re Kandel*, No. 11-62597,

2015 WL 1207014, at *8 (Bankr. N.D. Ohio Mar. 13, 2015).  "Showing a debtor

26

acted with fraudulent intent when failing to maintain or provide adequate records is not an element of § 727(a)(3)." *Id*. at *5; *In re Johnson*, 387 B.R. 728, 736 (Bankr. S.D. Ohio 2008).

Section 727(a)(3) outlines a two-step approach. First, the party objecting to the debtor's discharge carries the initial burden of proving that the debtor's records are inadequate. *Id.*; *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 829 (Bankr. N.D. Ohio 2004). Then, if the party objecting to discharge shows the absence of such records, the burden shifts to the debtor to establish that the failure to produce the records is justified under all the circumstances. *See D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 235 (2d Cir. 2006). *Accord In re Kandel*, 2015 WL 1207014, at *9-10 (detailing two-step approach for analyzing action to deny a discharge under § 727(a)(3)).

*Records of Global Financial, Give Records, and Bald Diner*

At the outset, the Court notes that there is some disagreement as to whether a debtor may be denied a discharge under 11 U.S.C. § 727(a)(3) for failing to maintain the recorded information of a business organization that is not the debtor. *See In re Spitko*, 357 B.R. 272, 307-08 (Bankr. E.D. Pa. 2006) (collecting cases). However, this Court agrees with the line of cases that holds that, "if 'corporate records are necessary to determine the debtor's financial condition, and the debtor

27

has not kept or preserved such records, the debtor's discharge should be denied pursuant to § 727(a)(3).' " *In re Asif*, 455 B.R. 768, 792 (Bankr. D. Kan. 2011) (quoting *Buckeye Ret. Co., LLC v. Bishop (In re Bishop)*, 420 B.R. 841, 851 (Bankr. N.D. Ala. 2009)). The argument is especially persuasive in situations – as was the case with Global Financial and Give Records – where the debtor "was the sole owner of and conducted business through a closely held corporation." *In re Mahfouz*, 529 B.R. 431, 449 (Bankr. D. Mass. 2015). *See also In re Kandel*, 2015 WL 1207014, at *7-8 (explaining how a lack of records from the debtor's business entities may form the basis for the denial of a debtor's individual discharge under § 727(a)(3)).

In the present case, it would be impossible to establish the debtor's financial condition and business transactions without a thorough understanding of the financial condition and business transactions of Global Financial and, to a lesser extent, Give Records and Bald Diner. A brief review of just the most salient facts shows the impossibility of deciphering the debtor's financial condition in the absence of the business records of these entities.

The debtor is the sole shareholder of Global Financial and Give Records, as listed on the corporations' tax returns, although there is some conflicting testimony that the debtor co-owns Give Records with Aaron Hendra. The debtor also has a

28

financial interest in Bald Diner.  The evidence showed that the debtor did not maintain or use a personal checking account, but used Global Financial's account to pay for nearly all of his personal and business expenses.  On his Schedule I the debtor listed Global Financial as his only employer for the past twenty-five years and his only reported income as $3,000 per month.  This income was listed on line 8a, which is labeled "Net income from rental property and from operating a business, profession, or farm."  The debtor did not attach a statement for each business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income as instructed by Schedule I, line 8a.  Additionally, on his Statement of Financial Affairs, the debtor reported income for the three years preceding his bankruptcy that is consistent with a gross income of $3,000 per month.  On the debtor's 2012 individual tax return, the debtor assigned $173,278 of the gross receipts or sales from Gulf Coast Insurance services to Global Financial, but this income is not accounted for on Global Financial's 2012 tax return.  The facts also showed that the debtor gave personal guarantees on more than one occasion for investment advice that was given, presumably, in the debtor's capacity as a Global Financial employee. Finally, despite listing Global Financial's 2014 gross sales as $512,553 with an ordinary business income of $145,005, the debtor listed the current value of his interest in Global Financial as "0" on line 13 of

29

Schedule B.

Similarly, the corporate structure of Give Records was not made entirely clear at trial, but the debtor testified at both the debtor's meeting of creditors and deposition that he owned Give Records. Give Records' 2012 and 2013 tax returns also list the debtor as owning 100 percent of Give Records' stock. Furthermore, on average the debtor, through Global Financial, transferred $5,000 to $6,000 per month from Global Financial's bank account to Give Records' bank account for many years preceding the bankruptcy.

Finally, despite alluding to his interest in Bald Diner in his deposition, the debtor's partnership interest in Bald Diner was not disclosed on the debtor's bankruptcy schedules or by name to the U.S. Trustee until March 4, 2016. Even at trial, the debtor's explanation of his interest in Bald Diner is most fairly characterized as vague, and it is impossible, without more information, to ascertain how the debtor's interest in Bald Diner may have affected the debtor's financial condition or played a role in his business transactions.

"[I]n situations where the facts indicate that a debtor exercised control over and conducted business through a closely held corporation, § 727(a)(3) inquiries cannot be artificially limited to those records that are, strictly speaking, those of the debtors." *Sterling International, Inc. v. Thomas (In re Thomas)*, No. 01-21302,

30

Adv. 01-6321, 2003 WL 21981707, at *11 (Bankr. D. Idaho July 17, 2003). Here,

the debtor's financial condition is inextricably intertwined with his business

entities. "Without being able to trace the financial history of [the debtor's] various

businesses, it is impossible to fully understand [the debtor's] personal finances in

this case." *Asif*, 455 B.R. at 793; *In re Kandel*, 2015 WL 1207014, at *8 ("This is

truly a situation where business records are needed to understand the debtor's

personal financial condition.").

*U.S. Trustee's Proof of Missing Recorded Information*

In order to meet its initial burden, a party objecting to the debtor's discharge

must:

> (1) offer evidence of the general nature of [the debtor's] business or
> personal financial position and the types of transactions about which
> recorded information is sought, (2) present evidence identifying the
> recorded information he alleges has been concealed, destroyed,
> mutilated, falsified or not kept or preserved by [the debtor], and
> (3) show how the missing recorded information "might" enable [the
> debtor's] actual financial condition or business transactions to be
> ascertained under the circumstances of the case.

*McDermott v. Neff (In re Neff)*, Case No. 14-33442, Adv. Pro. No. 15-3026,

2015 WL 9488240, at *2 (Bankr. N.D. Ohio Dec. 28, 2015) (citing *Devaul*,

318 B.R. at 829-33). Generally, this is not a difficult hurdle for a party objecting to

discharge to meet, "[b]ut Congress' use of the word 'might' emphasizes its

intended lack of rigor in the statutory standard." *Devaul*, 318 B.R. at 834.

31

The Court finds that the U.S. Trustee presented sufficient evidence of the general nature of the debtor's financial position and the types of recorded information which was sought. The U.S. Trustee showed that the debtor was the sole shareholder of Global Financial, a Florida corporation that marketed fixed-rate investment products to clients, and at least a co-owner of Give Records, a Florida LLC that was formed primarily to promote the musical career of Aaron Hendra. Additionally, the debtor has an interest in eight motion pictures that he produced as well as a partnership interest in Bald Diner, which the debtor testified at trial was an Ayurveda. Most importantly, the debtor paid nearly all of his personal and business expenses from Global Financial's checking account. Thus, the debtor's own financial condition is intertwined with that of Global Financial. In addition to the debtor's obligation to provide accurate and complete information on his bankruptcy schedules and Statement of Financial Affairs, which are "the starting point from which a trustee must begin an analysis to administer an estate," *Mahfouz*, 529 B.R. at 450, the U.S. Trustee also established that he was seeking additional recorded information that was the same as that requested by the Chapter 7 trustee through e-mail on October 31, 2014.

The U.S. Trustee also presented sufficient evidence to identify information that was not adequately kept or preserved by the debtor. In addition to the debtor's

less-than-forthcoming Bankruptcy Schedules and Statement of Financial Affairs –

which valued the debtor's interests in Global Financial and Give Records as zero,

failed to list the debtor's interest in eight motion pictures or Bald Diner, did not list

Camille Anderson as a creditor, and omitted payments made within the 90-day

preference period – the debtor's supplementation and later disclosures were

"piecemeal, disorganized and incomplete." *Mahfouz*, 529 B.R. at 450.  Although

Give Records showed inventory valued at $499,176 at the end of 2012, the debtor

either did not prepare or did not preserve a depreciation report for Give Records'

2013 tax return.  Additionally, a schedule was either never prepared or was not

preserved to explain $88,200 of "other costs" on Give Records' 2013 tax return.

Moreover, no Schedule C was filed on the debtor's individual tax return for his

sole proprietorship, Gulf Coast Insurance.  In addition to the lack of disclosure of

Bald Diner on any of the debtor's bankruptcy schedules or Statement of Financial

Affairs, the debtor either never prepared or did not preserve any tax information

related to Bald Diner, his interest in which he only disclosed five days before trial.

Finally, the U.S. Trustee presented sufficient information to show that the debtor

did not keep or preserve standard business records for Global Financial such as

1099s, Profit and Loss Statements, Balance Sheets, a 2013 depreciation report, and

invoices or statements to document the source of various deposits and wire transfer

credits made to Global Financial's bank account from June 2014 to September 2014.

The U.S. Trustee easily met his burden of showing how this missing information "might" enable the debtor's financial condition to be ascertained. The debtor's financial condition is inextricably intertwined with those of his companies. This debtor was not simply an employee of these companies, nor is he one shareholder of a larger business entity. He was the sole shareholder of Global Financial and Give Records; nearly all of his personal expenses were paid from Global Financial's coffers. The documents sought by the U.S. Trustee were all directly relevant to the financial condition or business transactions of Global Financial and Give Records, and, therefore, might enable a more full understanding of the debtor's financial condition.

### Defendant's Proof of Justification

After the party objecting to discharge has established the inadequacy of the debtor's records, the burden shifts to the debtor to show that any deficiency concerning his records is justified under all the circumstances of the case. In deciding whether the debtor has adequately justified the deficiencies in his records, courts often employ the test articulated in *Meridian Bank v. Alten*, 958 F.2d 1226 (3d Cir. 1992).

> The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances. The inquiry should include the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice.

*Meridian*, 958 F.2d at 1231 (quoting *In re Wilson*, 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983)). "Depending upon the sophistication of the debtor and the extent of his activities, different record keeping practices are necessary." *Id. See also In re Kandel*, 2015 WL 1207014, at *10 ("When evaluating a debtor's justifications . . . the adequacy of a debtor's records are based on what a reasonable person with the same level of financial sophistication would maintain while also managing a business of similar size and complexity.").

The debtor did not show that his failure to keep or preserve these records was justified under the circumstances of this case. All of the *Meridian* factors indicate the debtor was both sophisticated enough to know these records needed to be kept and involved in enough complex transactions that the failure to maintain such records was not justified. The debtor's own testimony established that he is an experienced and sophisticated businessman. Although the debtor did not attend college, he has been licensed to sell insurance products in Florida for nearly three decades. He has acquired similar licenses in two other states. Along with a

35

business partner, the debtor operated a Florida corporation which sold variable and fixed annuities for approximately fourteen years, during which time the corporation purchased a $900,000 commercial location. The large volume of the debtor's financial transactions, including the solicitation of large investments from individual investors, speaks to both the debtor's sophistication and the necessity of keeping regular business records such as 1099s, Profit and Loss Statements, Balance Sheets, depreciation reports, and invoices or statements which document the source of deposits and wire transfer credits.

Although the record is replete with references to the large volume of business conducted by the debtor, a short review of calendar years 2012, 2013, and 2014 will suffice. In October of 2012, the debtor sold a personal residence, valued at $1.6 million, to satisfy approximately $3.3 million in debt. In 2012, (1) Global Financial had gross receipts of $641,831, $48,334 in ordinary business income, and paid $117,028 in consulting fees, and (2) Give Records reported a business loss of $65,979, but held $499,176 in inventory. In 2013, (1) Global Financial reported $382,128 in gross receipts and sales and $45,256 in ordinary business income, claimed depreciation in the amount of $17,237, and paid $57,327 in consulting fees, and (2) Give Records reported no income, a loss of $45,474, and inventory in the amount of $587,376. In 2014, (1) Global Financial reported gross receipts or

36

sales of $512,553 and ordinary business income of $145,005, (2) Give Records did not file a tax return, and (3) the debtor's individual tax returns showed $737,766 in losses from partnerships and S corporations and a loss of $824,421 for Give Records.

The debtor's businesses are also varied and complex. Global Financial sold fixed annuity products in multiple states. Although Give Records primarily produced and promoted the music career of Aaron Hendra, the debtor testified that there were business plans to open a recording studio in Ohio as well. The debtor was involved in the production of eight different films. Finally, the debtor listed over $4,500,000 in liabilities on his bankruptcy petition against $7,970 of assets. Although the IRS tax lien accounts for approximately two-thirds of the debtor's total liabilities, well over $700,000 of the remaining debts are either related to the debtor's business or were paid by Global Financial during the preference period. These debts include $117,000 owed to Klaus Geithner, two debts of $225,000 and $93,000 owed to Kristin Nobles, and $300,000 owed to Lawrence & Sharon Anderson.

The debtor made little attempt to justify the lack of such business records but suggested compliance with the Code because the debtor and debtor's attorney made a good faith effort to produce documents to the Chapter 7 trustee and because the

37

U.S. Trustee did not aggressively pursue the production of these documents from third parties through subpoenas. While this justification may have merit in the context of a claim under 11 U.S.C. § 727(a)(4)(D), it misses the mark under § 727(a)(3). While § 727(a)(4)(D) is concerned with the debtor's "knowingly and fraudulently" withholding "recorded information," § 727(a)(3) encompasses even the debtor's failure to create the records in the first place and does not require an intent to defraud. *See Devaul*, 318 B.R. at 833 (discussing broad language of § 727(a)(3) and dual requirements to both "keep" and "preserve" recorded information from which the debtor's financial condition might be ascertained). Additionally, under § 727(a)(3), the failure of the Chapter 7 trustee or U.S. Trustee to aggressively pursue the requested documents from third parties does not exculpate the debtor for failing to turn them over in an organized fashion when they are first requested. *See Mahfouz*, 529 B.R. at 452 (noting that intent to conceal is not an element of a § 727(a)(3) objection to discharge and that partial compliance, through voluminous and disorganized records, was insufficient); *Asif*, 455 B.R. at 793 ("poor and oftentimes non-existent records," along with disregard for corporate formalities, "made it nearly impossible for this Trustee to do her job," and Trustee "seriously hampered" in requesting documents from third parties).

The Court finds that the debtor was not justified in failing to keep or

38

preserve adequate business records from which the debtor's financial condition might be ascertained, specifically the following:

- Global Financial: 2013 depreciation report, 1099s, profit and loss statements, balance sheets, and invoices or statements to document the source of various deposits and wire transfer credits made to Global Financial's bank account from June 2014 to September 2014;

- Give Records: 2013 depreciation report, 2013 schedule explaining "other costs" of $88,200;

- Bald Diner: any and all tax returns, 1099s, profit and loss statements, balance sheets;

- Gulf Coast Insurance: No Schedule C (Sole Proprietorships) attached to the debtor's individual tax returns;

- Any documentation related to the debtor's interest in motion pictures.

*Alter Ego*

The U.S. Trustee maintains that the debtor's closely held corporations – Global Financial and Give Records – should be treated as alter egos of the debtor under Ohio law. Under this theory, the assets of Global Financial and Give Records constitute direct property of the debtor's estate, as opposed the debtor's estate simply holding an ownership interest in the two corporations. The Court finds it unnecessary to decide whether these closely held corporations are alter egos of the debtor because an alter ego determination is not needed for a finding that the debtor has failed to keep or preserve records under 11 U.S.C. § 727(a)(3). Rather,

39

"[a] lack of business records relating to a company substantially intertwined with a debtor may provide the basis for the denial of a debtor's individual discharge under § 727(a)(3)." *In re Kandel*, 2015 WL 1207014, at *8. Moreover, unlike *In re Fisher* , 296 F. App'x 494 (6th Cir. 2008), which involved an Ohio "Subchapter S" corporation of the debtor and applied Ohio law, in the present case, Global Financial and Give Records are both Florida corporations, which presumably would require application of Florida law. *See* Restatement (Second) of Conflict of Laws § 309 (1971).

In short, the debtor's failure to keep or preserve records pertaining to his closely held corporations, including Global Financial, Give Records, and Bald Diner, makes it impossible to ascertain the debtor's own financial condition and business transactions as required under section 727(a)(3). Nor has the debtor shown that the deficiency of records is justified under all the circumstances of the case. Therefore, the debtor is denied a discharge under 11 U.S.C. § 727(a)(3).

*Count 5 – Failing to Adequately Explain Dissipation of Assets under 11 U.S.C. § 727(a)(5)*

11 U.S.C. § 727 provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless –
    * * * *
      (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's

40

liabilities[.]

11 U.S.C. § 727(a)(5). "A denial of discharge under § 727(a)(5) is 'closely

aligned' with a denial under § 727(a)(3)." *In re Roller*, Bankruptcy No. 12-61145,

Adversary No. 13-6050, 2014 WL 644590, at *15 (Bankr. N.D. Ohio

Feb. 19, 2014) (citing *In re Trogdon*, 111 B.R. 655, 659 (Bankr. N.D. Ohio 1990)).

Notably, § 727(a)(5) "simply imposes strict liability" – the plaintiff is not required

to prove that the debtor acted knowingly, fraudulently, or with bad intent.

*In re Lufkin*, 393 B.R. 585, 595 (Bankr. E.D. Tenn. 2008), *aff'd*,

2010 WL 1332114 (E.D. Tenn. Mar. 29, 2010). The plaintiff has the initial burden

of proving two conditions: (1) the debtor had a "cognizable ownership interest in a

specific fund(s) or identifiable piece of property; and (2) that such an interest

existed at a time not too far from when the petition was filed." *In re Reed*,

310 B.R. 363, 369 (Bankr. N.D. Ohio 2004). Section 727(a)(5) contains no explicit

time limitation; "[t]aken in its contextual setting this cannot be overlooked because

a number of other provisions which address potentially suspect transactions made

by a debtor employ a one-year look back window." *Id*. at 369-70. There is no

bright line test of what time frame constitutes "the time not too far from when the

petition was filed." In the *Reed* case, 18 months before the petition date was

"clearly . . . subject to [§ 727(a)(5)'s] scrutiny." *Id*. at 370. The *Devaul* case

41

examined the debtor's transactions a period of two to three years before the petition date. *Devaul*, 318 B.R. 824. One court noted that when the questionable transactions occurred "over a seven-year period reaching back ten years from the petition date," it is not surprising that the debtor cannot specifically describe the use of funds, nor is it surprising that the plaintiff could not offer contrary evidence of the use of those funds. *In re Stiff*, 519 B.R. 665, 669-70 (Bankr. E.D. Ky. 2014). Thus, the "time not too far from when the petition was filed," *i.e.*, the look back window for § 727(a)(5), can vary. "[Section 727(a)(5)] is broad enough to include any unexplained discrepancy or shortage of assets." *In re Johnson*, 387 B.R. at 739. Much of the Court's discussion of the debtor's failure to keep or preserve financial records is equally relevant here.

Here, the U.S. Trustee argues that the debtor violated § 727(a)(5) with regards to funds and hard assets of the debtor's corporations, Global Financial and Give Records: (1) the $181,000 of Global Financial's income for tax year 2014 that is untraceable in the corporation's bank records, and (2) the $137,171 of hard assets listed on the depreciation report of Give Records' 2012 tax return.

*$181,000 of Global Financial's Income for 2014*

The U.S. Trustee's bankruptcy analyst Catherine Lowman examined and compared Global Financial's 2014 tax return with Global Financial's bank records

42

and check register from tax year 2014. The return was prepared by the debtor's

CPA, signed by the debtor, and submitted to the IRS on May 26, 2015. Global

Financial's 2014 tax return reported gross receipts and sales of $512,553 in 2014.

Ms. Lowman identified $181,000 that was reported as part of the $512,553 but not

traceable in Global Financial's financial records (the bank records and check

register). The $181,000 portion of Global Financial's sales and receipts was

generated during the year the debtor filed for bankruptcy. The Court finds the

testimony and analysis provided by Ms. Lowman to be credible. Thus, the Court

finds that the U.S. Trustee has established by a preponderance of the evidence both

that the debtor had a cognizable ownership interest in the $181,000 of Global

Financial's 2014 sales and receipts and that his ownership interest existed during

the year he filed for bankruptcy.

*$137,171 of Give Records' Hard Assets*

Give Records' 2012 tax return depreciates $137,171 of hard assets, including

a variety of musical equipment. The report names 30 assets placed in service

between 2008 and 2011. Give Records' 2012 tax return was prepared by the

debtor's CPA, signed by the debtor, and filed with the IRS on November 15, 2013,

ten months before the debtor filed for bankruptcy.

The Court does not find credible the debtor's claim that his CPA mixed up

43

Give Records' 2012 tax return with Aaron Hendra's and that the depreciation report was therefore attached to the wrong return. Moreover, during his deposition, the debtor identified the assets on the 2012 depreciation report as the musical equipment from the La Collina studio (Plaintiff's Ex. 36-120).

The Court finds that the U.S. Trustee has satisfied the burden of proving that the debtor had an ownership interest in the $137,171 of Give Record's assets listed on its 2012 tax return and that the debtor's interest in these assets existed at a time not too far removed from September 23, 2014.

*The Debtor Must Provide a Reasonable Explanation*

Once the plaintiff has established the two initial conditions, the burden shifts to the debtor to provide an explanation that is "reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went." *Devaul*, 318 B.R. 839 (quoting *In re Farouki*, 133 B.R. 769, 777 (Bankr. E.D. Va. 1991)). "To be satisfactory, the explanation must demonstrate the debtor has exhibited good faith in conducting his affairs and explaining the loss of assets." *In re Costello*, 299 B.R. 882, 901 (Bankr. N.D. Ill. 2003). The word "satisfactory" may mean:

> reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the [debtors] say with reference to the disappearance or shortage.

44

He no longer wonders. He is contented.

*In re Hake*, 387 B.R. 490, 512 (Bankr. N.D. Ohio 2008) (quoting *In re Trogdon*, 111 B.R. at 659). Unsatisfactory explanations are those that are vague, indefinite, based upon estimates, or uncorroborated by documentation. *See Trogdon*, 111 B.R. at 659.

While the "existence or lack of corroborating documentation is generally relevant" to the credibility of the debtor's explanation, *Devaul*, 318 B.R. at 840, the Bankruptcy Code does not require a denial of discharge "for failure to produce corroborating papers where the debtor's testimonial assertions bear sufficient credibility." *In re Craig*, 140 B.R. 454, 459 (Bankr. N.D. Ohio 1992). When reviewing documentation to ascertain whether a debtor's explanation is satisfactory, courts have examined cancelled checks, check registers, bank records, the debtor's schedules, and corroborative testimony. *Hake*, 387 B.R. at 512.

*Explanation of $181,000 of Global Financial's 2014 Income*

At trial, the debtor did not provide any testimony or documentation explaining the $181,000 of income reported on Global Financial's 2014 tax return that was untraceable in Global Financial's financial records. Notably, Global Financial's 2014 return was not provided to the U.S. Trustee until five days before trial, so the U.S. Trustee was unable to question the debtor about the $181,000

45

deficiency at the meeting of creditors, 2004 exam, or deposition. Because the debtor provides no explanation at all for this deficiency, the Court concludes that the debtor has failed to meet his burden of providing an explanation that is "reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went." *Devaul*, 318 B.R. 839, quoting *In re Farouki*, 133 B.R. at 777.

*Explanation of $137,171 of Give Records' Hard Assets*

The documentation produced by the debtor does not provide any explanation for the disposition of Give Records' hard assets. Although the debtor provided the Court and the plaintiff with Give Records' 2013 tax return, the 2013 depreciation report is missing, making it impossible for the Court to ascertain what assets Give Records owned, purchased, or sold during 2013. Moreover, the debtor either did not file or provide Give Records' 2014 tax return. After the meeting of creditors, the Chapter 7 trustee requested that the debtor provide a signed statement describing the disposition of the $137,171 in hard assets listed on Give Records' 2012 tax return. This was never provided to the Chapter 7 trustee, the plaintiff, or the Court. Additionally, the debtor failed to provide any bills of sale, receipts, or check registers for Give Records that might show purchases or disposals of assets. Thus, the debtor has provided no documentation whatsoever demonstrating the

46

disposition of the hard assets listed on the 2012 return.

Furthermore, the debtor's testimony regarding the disposition of Give Records' hard assets is "vague, indefinite, based upon estimates, or uncorroborated by documentation." *See Trogdon*, 111 B.R. at 659. During his deposition, the debtor stated he "got rid of all the stuff from the studio," selling it for cash or checks (Plaintiff's Ex. 36-120, 36-126), but he could not specify any details of these sales or provide documentation. It is also unclear whether all of the assets were sold or whether Aaron Hendra and other band members possess them today. At the debtor's deposition, he asserted that Aaron Hendra and other band members own a significant portion of the equipment, which was "stuff that I – that I helped them with over a nine-year period" (describing the musical equipment purchased by Give Records) (Plaintiff's Ex. 36-123). The sole asset listed on the 2012 depreciation report that the debtor could identify as sold was the company's piano, which, purchased for $12,500, represents 9 percent of the 2012 depreciated assets. Accordingly, the debtor's explanation of the disposition of Give Records' hard assets is unsatisfactory under § 727(a)(5).

*Alter Ego*

As noted earlier, the Court need not decide whether the debtor's closely held corporations – Global Financial and Give Records – should be treated as alter egos

47

of the debtor under applicable state law in order to determine whether the debtor has failed to keep or preserve records under 11 U.S.C. § 727(a)(3). *See* discussion at pp. 39-40. Similarly, the Court need not decide whether Global Financial and Give Records should be treated as alter egos of the debtor in order to determine whether the debtor failed to adequately explain dissipation of assets under 11 U.S.C. § 727(a)(5). The debtor's ownership interests in these closely held corporations are undeniably property of the debtor's estate. Therefore, to the extent that the debtor has failed to adequately explain any corresponding dissipation in value of his ownership interests, the debtor is subject to a denial of discharge claim under 11 U.S.C. § 727(a)(5). *See Devaul*, 318 B.R. at 839-40.

In addition, some of the funds coming into Global Financial in 2014 may actually be direct assets of the debtor's estate. If the deposits designated as Flava Puff or Pacific Life were sales commissions earned by the *debtor* as opposed to Global Financial, then those deposits would be property of the debtor's estate. In fact, commissions received postpetition may also be property of the debtor's estate if all of the actions required to earn the commissions were completed prepetition. *In re Wicheff*, 214 B.R. 839, 841-42 (B.A.P. 6th Cir. 1998).

In short, the debtor has failed to adequately account for $181,000 in income that Global Financial reported on its 2014 tax return. The debtor has also failed to

48

adequately account for the disposition of $137,000 in hard assets that Give Records put into service between 2008 and 2012 and included in the depreciation report for its 2012 federal tax return. The debtor has therefore failed to explain the dissipation of his ownership interest in these two closely held corporations. Indeed, the incomplete information that was provided suggests that there may exist substantial sales commissions owed directly to the debtor (and may therefore constitute property of the estate) or owed to Global Financial (and suggesting that the debtor has diverted such commissions to some other entity). Therefore, the Court concludes that the U.S. Trustee has met his burden under § 727(a)(5) and that the debtor has not provided a reasonable, satisfactory explanation of the loss of these assets.

## CONCLUSION

The Court denies the debtor a discharge under the alternative theories of failing to keep or preserve records under 11 U.S.C. § 727(a)(3) and failing to adequately explain dissipation of assets under 11 U.S.C. § 727(a)(5). The Court therefore finds it unnecessary to address the U.S. Trustee's other theories for denying the debtor a discharge, as well as any corresponding defenses of the debtor.

IT IS SO ORDERED.